**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MICHAEL COLEMAN,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | )   **Case No.   11-cv-360-DRH** |
| | ) |
| **MARCUS HARDY,** | ) |
| | ) |
| **Respondent.** | ) |

**MEMORANDUM AND ORDER**

**HERNDON, Chief Judge:**

## I.   Introduction

This case is before the Court on a petition for writ of habeas corpus (Docs. 1 & 6).   Respondent has filed an Answer to the petition (Docs. 20, 21, 22). Petitioner has filed a Reply (Docs. 28 & 29).   Based on the following, the Court **DENIES** petitioner's habeas petition (Doc. 1).

## II.   Background

### A.   Procedural Background

### *1.   Facts*

Petitioner is currently incarcerated in Stateville Correctional Center where he is serving a natural life sentence for five counts of first degree murder (Doc. 20 Ex. B).   Petitioner was charged with the murders of David Thompson, Cedric Gardner, Marion Jennings, Bedford Jennings, and Jeff Mosby (*Id*. at 2).

At the trial numerous witnesses testified.   Kimberly Fulton testified that on

November 17, 1993, the night of the murders, she lived in a trailer in Eagle Park with her three children and Jeff Mosby (Doc. 21 Ex. B at p. 3).   Her neighbors in an adjacent trailer were David Thompson, Bedford Jennings, and Marion Jennings (*Id.*).   At 5:00 p.m. she left her house, picked up Demetria McIntyre, and eventually returned to the house around 10:00 or 10:15 p.m. (*Id.*).   As Kimberly Fulton pulled up to her trailer, she testified that she saw three men run from David Thompson's trailer and get into a green minivan (*Id.*).   Upon reaching the front door of her own trailer, she saw Jeff Mosby lying on the floor.   She tried to wake Mosby up but when she raised his shirt she saw a hole in his chest (*Id.*).   She started to go to Thompson's trailer for help but when she saw the gate was open she stopped because the house was a drug house and the gate was never open, so she believed that something was wrong (*Id.*).   Kimberly Fulton also found a box of important papers in her bedroom, which had been overturned (*Id.*).   Demetria McIntyre also testified that she was with Kimberly Fulton and went with Kimberly to her trailer on November 17, 1993 (*Id.* at p. 4).   She did not see the minivan but admitted she didn't have her glasses on at the time (*Id.*).

Christopher Fulton was eight years old at the time of the murders and also lived in the trailer with Kimberly Fulton and Jeff Mosby (Doc. 21 Ex. B at p. 4).   He testified that he was home with his two brothers and Mosby was barbecuing outside when "they" knocked on the trailer door (*Id.*).   The men told Mosby they wanted money and two of the three men went into the back bedroom and Christopher saw papers flying around (*Id.*).   When the two men returned from the bedroom, one of

the men shot Mosby (*Id*.).   Christopher testified that one of the men was "Little Mike" who Christopher identified as the petitioner (*Id*.).   The three men left in a green minivan.

Yuenna Sanders testified that she was Cedric Gardner's girlfriend and that Cedric lived with Thompson at the time of the murders (Doc. 21 Ex. B at 4).   She testified that Thompson kept bars over the door of his trailer that remained locked (*Id*.).   Alvin Laws also testified that he knew Mosby and had been inside Thompson's trailer and that he kept bars on the trailer door and only Thompson could let people in the house (*Id*.).

Laws also stated that he was on Hare Street on November 17, 1993 and that he saw a green minivan speed by (Doc. 21 Ex. B at 4).   He saw three people inside the van but was unable to identify them because they had hoods on (*Id*. at 4-5).

Candice Branch testified that she lived down the street from Thompson and that on November 17, 1993 she was walking home around 10:00 p.m. (Doc. 21 Ex. B at 5).   She testified that she saw three men standing by Thompson's mailbox and that a van was parked by the fence (*Id*.).   She later saw Sherrell Towns and identified him as one of the men outside of Thompson's trailer.   She also identified Sherrell from a photographic lineup (*Id*.).

Odette Brent testified that she was Thompson's girlfriend and she also testified that Thompson's trailer door had locked bars and that only Thompson possessed a key to unlock the bars (*Id*.).   She testified that she and Thompson knew the petitioner and although she had seen the petitioner at the trailer she had

never seen him inside the trailer (*Id*.).

Warren Rice testified that he was the manager of Dave Croft Motors and that he rented a 1994 green minivan to Elmer Jennings on November 6, 1993 (Doc. 21 Ex. B at 5).   The minivan was not returned before November 24, 1993 (*Id*.). Elmer Jennings testified that he rented the minivan at the request of Roosevelt Towns as Roosevelt did not have a driver's license (*Id*.).   Roosevelt drove the van after Elmer Jennings rented it.   He also saw Sherrell Towns driving the minivan and saw Sherrell washing the van at a car wash on November 18, 1993 (*Id*. at 5-6).

Darren Wise testified that he also lived in Eagle Park and knew petitioner and had seen him at Thompson's trailer (Doc. 21 Ex. B at 6).   On the night of November 17, 1993, he heard gunshots from his mother's house, a block away from Thompson's trailer (*Id*.).   He saw a green minivan speed past his street but did not see who was in the van (*Id*.).

Yulanda Allen testified that she was Sherrell Town's girlfriend and knew the petitioner by sight.   She stopped by Sherrell's house in the evening on November 17, 1993 and, at the trial, she could not recall who was with Sherrell at the house (Doc. 21 Ex. B at 6).   She did admit that she testified at an earlier proceeding that she saw petitioner and Ramone Williams with Sherrell (*Id*.).   She also saw Sherrell with a green minivan.

Johnnie Mosley testified that he was Sherrell Towns' cousin and that he was friends with Ramone Williams and petitioner (Doc. 21 Ex. B at p. 6).   Mosley had seen petitioner, Ramone, and Sherrell together on a couple of occasions between

February and October 1993 (*Id*.).   On November 17, 1993, Mosley testified that Sherrell came by in a green minivan and that Ramone Williams and Artis Murray were with Sherrell (*Id*.).   Sherrell asked Mosley if he wanted "to take care of some business" which Mosley believed meant to commit an armed robbery (*Id*.).   Mosley saw that Sherrell had a 9-millimeter gun at the time (*Id*.).   Mosley declined to go with them.   Sherrell told Mosley that he was going to pick up "Little Mike", referring to petitioner, because he knew the people they were going to rob and that the people were drug dealers and they would kill the drug dealers if they had to (*Id*. at 6-7).

Chontelle Clark testified she knew Sherrell and at 10:30 p.m. on the night in question she was driving towards Washington Park and saw Ramone and Sherrell drive by in a dark colored vehicle (Doc. 21 Ex. B at 7).   Artis Murray testified that he spent the night of November 17, 1993 with his girlfriend, Dawn Russell, at the Sleepy Hollow hotel and that the following morning Sherrell picked him up in a green minivan (*Id*.).   They then went to the car wash where Sherrell cleaned the car and vacuemed out the inside (*Id*.).   Murray and Sherrell were both arrested that same day, November 18, 1993.   His girlfriend, Dawn Russell, corroborated Clark's testimony that he was at the hotel all night (*Id*.).

Alfred Lumpkins testified that he was in jail in late 1993 and early 1994 for writing bad checks and that he and petitioner were placed in the same cell together (Doc. 21 Ex. B at 7).   Lumpkins testified that petitioner told him that he went to buy drugs from people he knew in Eagle Park and that two other men went with him

(*Id*.).   Once insider the trailer, petitioner ordered the other two men to tie four victims hands behind their backs and they then ransacked the trailer for money and drugs (*Id*.).   Petitioner then ordered the other two men to shoot the victims as they could identify the petitioner (*Id*.).   Petitioner also told Lumpkins that as they were leaving there was a guy standing outside that could have identified them so he ordered one of the two men to shoot him (*Id*. at 7-8).   Petitioner also stated there was an eight year old boy that could have recognized them as they were leaving the trailer.   Petitioner told Lumpkins they went to his uncle's house to burn the clothes and then to a St. Louis nightclub (*Id*. at 8).

Michael Lockett and Robert Lockett also testified that they were jailed with petitioner and would wait in the same visiting room as petitioner to meet with their attorney, as all three individuals had the same attorney (Doc. 21 Ex. B at 8). Michael Lockett knew petitioner before they were incarcerated and overheard a conversation between petitioner and Robert Lockett on one occasion while awaiting their attorney (*Id*. at 9).   Michael testified that petitioner told Robert that once they entered Thompson's trailer one of the other men accidently shot one of the victims, so petitioner "did them all, and he had to go next door to take care of the guy there because he knew Little Mike."   (*Id*.)   Petitioner told Robert that the men with him were Sherrell Towns and Ramone Williams (*Id*.).   Michael wrote a letter to police after overhearing the conversation (*Id*.).   Robert also testified that he was in the same cell block as Sherrell Towns and that he knew petitioner (*Id*. at 10).   Robert testified that while with petitioner one day in the summer of 1993, he pointed out

Thompson and Beford and told Robert that "they were about to come into a lick" which meant they were going to get drugs and money (*Id*.).   Robert testified that petitioner suggested that Robert and Michael rob Thompson but that did not occur because Michael was arrested (*Id*.).   While waiting to see their attorney with petitioner, Robert testified that petitioner told him that he got the three inside Thompson's trailer and that "the dude reacted the way he reacted [and] then he got hit in the chest."   (*Id*. at 10-11).   Petitioner then stated they had to kill all of victims because they had seen his face and that they had to shoot Mosby for the same reason (*Id*. at 11).

Crime scene investigators Mark Johnsey and Morrie Fraser, both from the Illinois State Police, testified about the crime scenes that they investigated on November 17, 1993.   Mark Johnsey investigated Thompson's trailer and stated there were three bodies at the trailer and he was informed a fourth person had been taken to the hospital (Doc. 21 Ex. B at 11).   He found that Bedford's hands, mouth, and ankles were bound with duct tape (*Id*.).   Thompson's ankles were also bound with duct tape but only his right wrist had duct tape (*Id*.).   Marion was not bound. Morrie Fraser investigated Mosby's trailer and found a shell casing and documents strewn on the bed in the bedroom (*Id*.).   Stephen Nonn, a deputy sheriff assisted the crime scene investigators and arrested Sherrell Towns on November 18, 1993. He seized the green minivan.   He also interviewed petitioner who denied knowing Sherrell (*Id*.).

Forensic scientist Tom Gamboe, with the Illinois State Police, analyzed the

shell casings and spent projectiles and determined that the casings were fired from a 9-millimeter and that all of the shells were fired from the same gun (Doc. 21 Ex. B at 21).   He also determined that three of the four spent projectiles were fired from the same gun (*Id.*).   Forensic scientist Gerald Warner, also with the Illinois State Police, testified that he analyzed the fingerprints found on the duct tape and matched the fingerprints to Sherrell Towns (*Id.*).   Sherrell Towns' fingerprints were also found on the documents in Mosby's trailer (*Id.*).   Both sides stipulated that the autopsies findings would reveal that Gardner died from a gunshot wound to the head, Thompson died from a gunshot wound to the head, Marion died from gunshot wounds to the chest and head, and Bedford died from a gunshot wound to the head (*Id.*).   The parties also stipulated that Mosby died of a gunshot wound to the chest.   The parties further stipulated that Jeff Bridick, a Madison County deputy sheriff would have stated he interviewed Christopher Fulton and that while Christopher described the gun used on Mosby he could not name and did not know the three men involved in the shooting (*Id.* at 13).

Petitioner's grandmother testified that petitioner lived with her and that on the night of November 17, 1993 he left just before the 10:00 p.m. news (Doc. 21 Ex. B at 12).   His cousin, Eric Coleman, also lived with their grandmother and testified petitioner left around 8:00 p.m., but admitted he originally testified in an earlier proceeding that petitioner had left around 10:00 p.m. (*Id.*).   Eric Coleman testified that he and petitioner went to a nightclub in St. Louis around 10:15 p.m. and they left a half hour later and went to Club Hollywood in East St. Louis (*Id.*).   They

arrived around midnight and stayed at the club until 2:00 a.m.

Michelle Garrett testified that she knew the petitioner most of her life and that she went to Club Hollywood between 11:00 p.m. and 12:00 a.m. and that petitioner arrived sometime after her with his cousin Eric (Doc. 21 Ex. B at 13). After the murders, while petitioner was in jail, Garrett received a call from him asking her to lie about the time she saw him at the club, to say she saw him earlier than she actually did (*Id.*).   Irhett Riley testified that she also knew the petitioner and that he called her two months before the trial and asked her not to come to court (*Id.*).

Petitioner was originally found guilty of all five counts of first degree murder on October 1, 1994.   However, his conviction was reversed on appeal on the grounds that his defense counsel had a conflict of interest, having represented two of the state witnesses in other unrelated criminal cases (Doc. 21 Ex. B at p. 2). Petitioner's case was remanded for a new trial and he was again found guilty in 1999 on all five counts and sentenced to natural life imprisonment (*Id.*).

### 2.   *State Court Proceedings*

After Petitioner's guilty verdict, he appealed his sentence to the state appellate court (Doc. 20 at 2; Doc. 21 Ex. B at 2-3).   Petitioner raised two issues on his appeal:

(1)   that he was deprived of a fair trial because evidence of other crimes was introduced at his trial and trial counsel was ineffective for failing to object to the admission of this evidence; and

(2)   his trial counsel was ineffective in three ways, namely:

(a)     for failing to impeach state witness Christopher Fulton, with his prior testimony from petitioner's first trial that he could not identify those involved in the murder;

(b)     for failing to object to hearsay evidence that Sherrell Townes stated that petitioner had told Townes that he was going to rob drug dealers; and

(c)     for failing to move to strike Irhett's Riley's testimony concerning statements petitioner made to her where petitioner told Michelle Garrett not to testify at his trial.

(Doc. 21 Ex. B at 1-2).   The appellate court affirmed petitioner's verdict on September 6, 2006 (*Id*).

Petitioner filed a petition for leave to appeal (PLA) with the state supreme court, raising the same issues as in his direct appeal (Doc. 21 Ex. F).   The Supreme Court denied his PLA (Doc. 21 Ex. G).

On August 23, 2002, petitioner filed a post-conviction petition pursuant to 725 ILCS 5/122-1, *et seq.*, raising the following issues:

(1)     the trial court abused its discretion in denying petitioner's motion for a mistrial when State witness Michelle Garrett referenced petitioner's first trial;

(2)     Petitioner's due process rights were violated when the trial court issued Illinois Pattern Jury Instruction 3.06 to the jury;

(3)     Petitioner was denied due process when the trial court admitted the stipulation of crime scene technician, Mark Johnson, into evidence;

(4)     the trial court erred in allowing the State to use police reports to refresh the recollection of Johnnie Mosley;

(5)     the trial court erred in denying petitioner's motion for a mistrial when Michael Lockett referred to petitioner's first trial;

(6)     the trial court abused its discretion in denying petitioner's motion *in limine* and allowing Michael Lockett to testify to petitioner's prior bad

acts;

(7)    trial counsel was ineffective in:

    (a)    "agreeing with the State's Attorney" that there would be impeachment of witnesses;

    (b)    failing to object to the State's misquoting of Candice Branch's testimony;

    (c)    failing to object to Johnnie Mosley's hearsay testimony that Sherrell Townes stated that petitioner had told Townes that he was going to rob drug dealers;

    (d)    failing to object to the State's leading questions to Artis Murray;

    (e)    failing to object to Michael Lockett's hearsay testimony regarding conversations petitioner had with Robert Lockett;

    (f)    failing to impeach Michael Lockett's testimony with Robert Lockett's allegedly inconsistent testimony;

    (g)    not "following up" on the improper admission of other crimes evidence;

    (h)    failing to object to the State's opening argument regarding its intent to impeach petitioner's witnesses;

    (i)    failing to impeach Christopher Fulton with inconsistencies in his testimony;

    (j)    failing to investigate the facts of petitioner's case; and

    (k)    allowing Robert Lockett, Michael Lockett, and Alfred Lumpkins to testify against petitioner because all three were jailhouse informants and obtained evidence against him while petitioner was in custody;

(8)    the State committed prosecutorial misconduct when it:

    (a)    allowed Alfred Lumpkins to give perjured testimony regarding Lumpkins' prior conviction;

    (b)    allowed Alfred Lumpkins to testify when such testimony violated petitioner's Sixth Amendment right to assistance of counsel;

(c)     allowed Lumpkins to "utilize" knowingly perjured testimony;

(d)     allowed Lumpkins's knowingly false testimony to go uncorrected;

(e)     arrested petitioner's witness, Eric Coleman, for perjury because Coleman provided an alibi for petitioner;

(f)     stated in its opening argument that it would "utilize impeachment testimonies"; and

(g)     allowed Artis Murray to give knowingly perjured testimony; and

(9)     appellate counsel on direct appeal was ineffective for failing to raise the above noted issues.

(Doc. 21 Ex. H).   Petitioner then filed a motion to supplement his post-conviction petition, adding a claim that trial counsel was ineffective for failing to: (1) object to all-white jury venire; and (2) object to the lack of a fair cross-section of individuals from petitioner's community and the State's purposeful exclusion of African-Americans from the jury.   (Doc. 21 Ex. I).   Petitioner was appointed counsel and the case proceeded to an evidentiary hearing.   Following the evidentiary hearing, the state post-conviction trial court denied petitioner's petition (Doc. 21 Ex. K).

Petitioner raised only one claim on appeal: that the post-conviction trial court erred in failing to address the claim raised in petitioner's supplement (Doc. 21 Ex. L).   The appellate court affirmed the dismissal of the post-conviction petition (Doc. 21 Ex. J).

Petitioner subsequently filed a PLA in the state supreme court, alleging the following:

(1)   the State knowingly used the perjured testimony of Michael Lockett, Robert Lockett, Alfred Lumpkings, and Artis Murray;

(2)   Petitioner's trial judge suffered from a conflict of interest;

(3)   trial counsel was ineffective in failing to:
   (a)   object to Jonnie Mosley's false testimony;

   (b)   impeach the false testimony of Michael Lockett, Robert Lockett, and Alfred Lumpkins;

   (c)   follow up on the State's use of other crimes evidence;

   (d)   impeach Christopher Fulton's testimony with prior inconsistent testimony; and

   (e)   object to the false testimony of Alfred Lumpkings; and

(4)   post-conviction appellate counsel was ineffective for failing to raise the above noted issues in the post-conviction appeal.

(Doc. 21 Ex. N).   The state supreme court denied the PLA (Doc. 21 Ex. O).

## B.   Habeas Petition

On January 31, 2011, petitioner filed the instant habeas petition.   Petitioner raised the following issues in his petition, as set forth by respondent in his responsive brief:

(1)   the State committed prosecutorial misconduct when it knowingly allowed its witness, Alfred Lumpkins, to give false testimony regarding Lumpkins' prior criminal history;

(2)   the admission of testimony of Robert Lockett, Michael Lockett, and Alfred Lumplkins violated petitioner's Sixth Amendment right to assistance of counsel where the witnesses were jailhouse informants and the petitioner was in custody when he made the incriminating statements to them.

(3)   trial counsel was ineffective for failing to:
   (a)   impeach Christopher Fulton's testimony with his prior inconsistent statements from petitioner's first trial;

(b)  impeach the testimony of Michael Lockett, Robert Lockett, and Alfred Lumpkins with the fact that they were jailhouse informants;

(c)  object to State's use of other crimes evidence;

(4)  appellate counsel was ineffective for failing to raise the claims in petitioner's post-conviction petition and supplemental petition in his post-conviction appeal;

(5)  Petitioner's trial judge suffered from a conflict of interest;

(6)  the State knowingly used the perjured testimony of Alfred Lumpkins when he testified that he did not know the Assistant State's Attorney, which Petitioner alleges was untrue;

(7)  the State knowingly used the perjured testimony of Artis Murray;

(8)  the state appellate court in petitioner's post-conviction appeal erred in denying his request to file a *pro se* supplemental brief.

(Doc. 1; Doc. 20 at pp. 6-7).

### III.  Analysis

The Anti-Terrorism and Death Penalty Act of 1996 ("AEDPA") allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C.§ 2554(a).   Before considering the merits of a habeas petition, a federal court must ensure that the petitioner has exhausted all available state remedies and fairly presented all of the claims in his habeas petition to the state courts.  *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004); *Spreitzer v. Schomig*, 219 F.3d 639, 644 (7th Cir. 2000).

A.     **Non-cognizable Claims**

Respondent argues that two of petitioner's claims before the Court are non-cognizable under § 2254.   These include petitioner's claim appellate counsel was ineffective for failing to raise the claims in petitioner's postconviction petition and supplemental petition in his post-conviction appeal (Claim 4) and petitioner's claim that the state appellate court in his post-conviction appeal erred in denying his request to file a *pro se* supplemental brief.

1.     ***Ineffective post-conviction appellate counsel (Claim 4)***

Respondent argues that petitioner's claim that his appellate post-conviction counsel was ineffective for failing to raise claims in his post-conviction and supplemental petition in his post-conviction appeal is non-cognizable because there is no constitutional right to effective assistance of counsel on collateral review. Section 2254(i) indicates that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief" under § 2254.   See 28 U.S.C. §2254(i).   Further, as respondent has pointed out, there is no constitutional right to effective assistance of counsel on collateral review.   *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)(pointing out that the Supreme Court has never held that prisoners have constitutional right to counsel in post-conviction proceedings).   Thus, petitioner's claim of ineffective post-conviction counsel is not cognizable as it cannot be brought under § 2554 and he does not have a constitutional right to effective counsel at the post-conviction level.

### 2.    *Errors of state appellate court in post-conviction appeal (Claim 8)*

Respondent also argues that petitioner's claim that the state appellate court erred by denying his request to file a pro se supplemental brief is non-cognizable. Respondent argues that petitioner's claim alleges a violation of state law, namely, whether the state erred in its application of Illinois' rule against hybrid representation and, thus, is not a grounds for federal habeas review.

The power of the court in a habeas petition is limited to reviewing violations of federal rights, so only if the state court has deprived a petitioner of some federal right may the federal court intervene. *Perruquet v. Briley,* 390 F.3d 505, 511 (7th Cir. 2004). An error in state collateral review does not normally form the basis of a habeas petition as the constitution does not require states to provide collateral review of their criminal convictions. Further, state post-conviction collateral proceedings are civil in nature, and § 2254 only provides relief for violations of federal law which occur in criminal convictions. *U.S. ex rel. Jones v. Chrans*, 187 F.Supp. 2d 993, 1002 (N.D. Ill. 2002) (citing 28 U.S.C. § 2254(a)). Therefore, petitioner cannot obtain relief for errors that occurred during the state post-conviction proceedings, as § 2254 does not afford relief for those type of errors. *Id*. (citing *Pennsylvania v. Finley*, 481 U.S. 551, 556-57, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)). Thus, petitioner's Claim 8, related to errors of the post-conviction appeals court is not cognizable.

### B.    Procedural Default

Respondent argues that a number of petitioner's claims are procedurally defaulted.   Specifically, respondent argues that petitioner's following claims are procedurally defaulted because he did not raise the claims on appellate review of his post-conviction petition:

Claim 1:   the State committed prosecutorial misconduct when it knowingly allowed its witness, Alfred Lumpkins, to give false testimony regarding Lumpkins' prior criminal history;

Claim 2:   the admission of testimony of Robert Lockett, Michael Lockett, and Alfred Lumpkins violated petitioner's Sixth Amendment right to assistance of counsel where the witnesses were jailhouse informants and the petitioner was in custody when he made the incriminating statements to them.

Claim 3 (b): trial counsel was ineffective for failing to impeach the testimony of Michael Lockett, Robert Lockett, and Alfred Lumpkins with the fact that they were jailhouse informants;

Claim 5:   Petitioner's trial judge suffered from a conflict of interest;

Claim 6:   the State knowingly used the perjured testimony of Alfred Lumpkins when he testified that he did not know the Assistant State's Attorney, which petitioner alleges was untrue; and

Claim 7:   the State knowingly used the perjured testimony of Artis Murray.

In order for a federal court to address the merits of a habeas petition, the petitioner must have exhausted his available remedies in state court and not have any of his claims procedurally defaulted.   28 U.S.C. § 2254(b)(1)(A); *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991).   These limitations allow state courts a fair opportunity to hear and act on a petitioner's claims.   *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999).

The procedural default doctrine prevents the federal court from reaching the

merits of a petitioner's habeas petition when either "(1) that claim was presented to the state courts and the state-court ruling against the petitioner rests on adequate and independent state-law procedural grounds, or (2) the claim was not presented to the state courts and it is clear that those courts would now hold the claim procedurally barred." *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 & n. 1, 111 S.Ct. 2456, 115 L.Ed.2d 640 (1991)). It is the second type of procedural default that respondent argues is at issue in this case. A petitioner is required to present his federal habeas claim through one complete round of state court review, either on direct appeal or through a postconviction petition. *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004); *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) (one complete round of review includes a petition for discretionary review to highest court in the state and applies equally to claims brought up on collateral review). In Illinois, this means that a petitioner must have raised the claim on appeal and then presented the claim again in a petition for leave to appeal to the Illinois Supreme Court. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). When a petitioner has exhausted his state court remedies, but fails to raise his federal claim at each level of state review then his claim is procedurally defaulted. *Id*; *Perruquet*, 390 F.3d at 514.

A petitioner's claim which has been procedurally defaulted is usually barred from habeas review, unless the petitioner can show cause and prejudice for the default or he can show that the denial of relief will result in a fundamental

miscarriage of justice. *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010) (citing *Holmes v. Hardy*, 608 F.3d 963, 967 (7th Cir. 2010)); *Lewis*, 390 F.3d at 1026; *Gonzales v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009). A petitioner can show cause by demonstrating that some sort of external factor prevented him from presenting his habeas claim to the state court. *Lewis*, 390 F.3d at 1026. "Prejudice is established by showing that the violation of the petitioner's federal rights 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Lewis*, 390 F.3d at 1026 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). A petitioner may also overcome a procedural default by showing that the denial will result in a fundamental miscarriage of justice. To show a fundamental miscarriage of justice, the petitioner must show that "he is actually innocent of the offense . . . , [in other words] that no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court." *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327-29 (1995)). To show actual innocence, a petitioner must support his allegations "with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. 298, 324; *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003).

Thus, "[f]ederal habeas relief is available only when a petitioner has given the state courts a full and fair opportunity to review a claim, when there is cause and prejudice for the failure to raise the claim in state court or when the default would

lead to a fundamental miscarriage of justice."   *Steward v. Gilmore*, 80 F.3d 1205, 1211 (7th Cir. 1996)(citations omitted).

Here, the Court notes that petitioner only raised his Claim 5 regarding the trial judge's conflict of interest in his post-conviction PLA, but failed to present the claim in either his post-conviction petition or post-conviction appeal.   Thus, petitioner failed to present Claim 5 through one entire round of state court review and the claim is procedurally defaulted.

As to the other claims, although petitioner did raise his Claims 1, 2, 3(b), 6, and 7 in his Post-conviction petition, he failed to raise those claims on his post-conviction appeal.   There is evidence in the record that petitioner attempted to file a *pro se* brief containing Claims 1, 2, 3(b), 6, and 7, but the appellate court rejected the *pro se* supplement upon the state's motion to strike (Doc. 22 Exs. GG & II).   Thus, petitioner procedurally defaulted these claims by failing to raise them on his post-conviction appeal.

While petitioner does not specifically state a "cause" for this default, his habeas petition also raises the claim of ineffective assistance of post-conviction counsel because, he argues, that his post-conviction appellate counsel failed to raise his requested issues from his post-conviction petition in his post-conviction appeal. While ineffective assistance of post-conviction counsel is not a grounds for habeas relief nor is it usually grounds for excusing procedural default, *see Coleman v. Thompson*, 501 U.S. 722, 757, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Maples v. Thomas*, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012), the Supreme Court has

recently carved out a "narrow exception" to the general rule, allowing court's reviewing habeas petitions to find "cause", excusing procedural default, when post-conviction counsel is ineffective.  *See Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012); *Trevino v. Thaler*, 133 S.Ct. 1911 (2013).   This narrow exception only allows an ineffective assistance of trial counsel claim, which was procedurally defaulted due to the ineffective assistance of post-conviciton counsel, to be excused for cause.  *Martinez*, 132 S.Ct. at 1315.

Under *Martinez*, procedural default may be excused "where (1) the claim of 'ineffective assistance of trial counsel' was a 'substantial claim'; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and (4) state law requires that an 'ineffective assistance of trial counsel [claim]…be raised in an initial-review collateral proceeding."   *Trevino*, 133 S.Ct. at 1918 (quoting *Martinez*, 132 S.Ct. at 1318-19, 1320-21).   The Supreme Court later clarified the fourth prong of the test in *Trevino* by holding that if state law allows a defendant to present an ineffective assistance of trial counsel on direct appeal but the law "— as a matter of its structure, design, and operation — does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal" then the narrow exception to procedural default will also apply.   *Trevino*, 133 S.Ct. at 1921.

In this case, petitioner's Claims 1, 2, 5, 6, and 7 cannot benefit from the

narrow exception offered in *Martinez* as petitioner's claims involve other constitutional violations not related to ineffective assistance of counsel.   Also petitioner has failed to offer any other cause for this failure to raise the claims through one complete round of state review.   Thus, those claims are procedurally defaulted.   However, petitioner's Claim 3(b) alleges that trial counsel was ineffective for failing to impeach the testimony of the Lockett brothers and Alfred Lumpkins.   This limited claim could be excused of its procedural default if it meets the requirements set forth in *Martinez* and *Trevino*.

Here, however, petitioner cannot take advantage in the limited exception provided by *Martinez* and *Trevino*.   Petitioner argues that his post-conviction appellate counsel was ineffective for failing to raise the claims in his post-conviction petition and failing to adopt his supplemental petition.   However, the holding in *Martinez* is limited to attorney errors in the *initial*-review collateral proceeding; it does not encompass "attorney errors in other kinds of proceedings, including *appeals* from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review. . . ."   *Martinez*, 132 S.Ct. at 1320 (emphasis added).   The holding "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial."   *Id.*   Petitioner argues in his brief that his post-conviction *appellate* counsel was ineffective because she would not include any of his requested issues in the brief, nor did she include any issues from his original post-conviction petition.   The *Martinez* holding, however, does not extend

to petitioner's appeal.   Further, petitioner raised his claims in his original post-conviction petition, thus there is no evidence, and petitioner has not argued, that there were attorney errors in his initial-review collateral proceeding. Accordingly, petitioner's claims do not fall into the narrow exception established by *Martinez* and *Trevino* and his procedural default, thus, cannot be excused for cause.[1]   Petitioner's ineffective assistance of counsel claim (Claim 3(b)) must fail because it is procedurally defaulted.

**C.**      **Merits of Remaining Claims**

Respondent argues that petitioner's two remaining claims, Claim 3(a) his claim that trial counsel was ineffective for failing to impeach Christopher Fulton and Claim 3(c) his claim that trial counsel was ineffective for failing to object to the State's use of other crimes evidence, were fully and fairly presented to the state courts but must fail on the merits.

These remaining viable claims are subject to the provisions of the Antiterrorism and Effective Death Penalty Act, known as AEDPA.   "The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."   *Bell v. Cone*, 535 U.S. 685, 693, 122 S.Ct. 1843 (2002).

Habeas is not another round of appellate review.   Federal courts do not

---

[1]  The Court need not decide whether Illinois law provides individuals, either expressly or in operation, with a "meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal", *see Trevino*, 133 S.Ct. at 1921, 185 L.Ed.2d 1044, as *Martinez* clearly holds that the narrow exception does not extend to errors on appeals of collateral proceedings and Petitioner's claims of "cause", thus, fail on that basis alone.

review state court determinations of state law questions on habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Bloyer v. Peters*, 5 F.3d 1093, 1098 (7th Cir. 1993).   Section 2254(d) restricts habeas relief to cases wherein the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The issue for this court on habeas review is whether the state court's decision was "contrary to" or constituted an "unreasonable application of" Supreme Court precedent.   28 U.S.C. §2254(d)(1).   "Avoiding these pitfalls does not require citation to [Supreme Court] cases — indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362 (2002) (emphasis in original).   The Supreme Court most recently announced that in reviewing a habeas petition, the reviewing court must decide if "fairminded jurists could disagree" that a state court decision conflicts with Supreme Court precedent.  *See Harrington v. Richter*, 131 S.Ct. 770, 786 (2011); *Cullen v. Pinbolster*, 131 S.Ct. 1388, 1402 (2011).

The Seventh Circuit has noted that the scope of federal review of state court decisions on habeas is "strictly limited" by 28 U.S.C. § 2254(d)(1).  *Jackson v. Frank*, 348 F.3d 658, 661 (7th Cri. 2003).   The unreasonable application

standard is "a difficult standard to meet."  *Id*. at 662.   Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, the state court application must be "something like lying well outside the boundaries of permissible differences of opinion."  *Id*. at 662 (internal citation omitted).

### 1.    *Claim 3(a)*

Petitioner first argues that his counsel was ineffective for failing to impeach Christopher Fulton's testimony.   Specifically, petitioner argues that Fulton gave testimony in the first trial that was contradictory to his testimony in the trial at issue.   Whether counsel was ineffective is governed by *Strickland v. Washington*, 466 U.S. 668 (1984).   The Seventh Circuit has emphasized that, when considering a claim of ineffective assistance of counsel on habeas cases, federal courts must honor any "reasonable" state court decision; "only a clear error in applying Strickland's standard would support a writ of habeas corpus."   *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997).   Both the *Strickland* standard and a review under § 2254 are highly differential on their own, but "when the two apply in tandem, review is 'doubly' so."   *Harrington*, 131 S.Ct. at 788; *Cullen*, 131 S.Ct. at 1403 (counsel strongly presumed to have rendered adequate assistance and review of assistance under habeas is "doubly deferential").   *Strickland* requires that a petitioner on an ineffective assistance of counsel claim prove (1) that counsel's performance "fell below an objective standard of reasonableness" ("the performance prong"), and (2) "that the deficient performance prejudiced the

defense" ("the prejudice prong").   *Strickland*, 466 U.S. at 688, 692.   To establish prejudice, a petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Morgan v. Hardy*, 662 F.3d 790, 802 (7th Cir. 2011)(quoting *Strickland*, 466 U.S. at 693); *Newman v. Harrington*, Case No. 12-3725, 2013 WL 4033893 (7th Cir. Aug. 9, 2013).   In order for the writ to issue, a habeas petitioner must satisfy both prongs of the *Strickland* analysis.   However, there is no mandatory order for the analysis, and a habeas court does not need "to address both components of the inquiry if the defendant makes an insufficient showing on one."   *Id*. at 697.

Here, the Court finds that the Appellate Court properly applied the principles set forth in *Strickland*.   Although the Appellate Court does not specifically mention *Strickland*, the Appellate Court relied on an Illinois decision which properly set forth the *Strickland* standard.   *See People v. Albanese*, 104 Ill.2d 504, 525, 473 N.E.2d 1246, 1255 (Ill. 1984).   Further, the Appellate Court's findings were not unreasonable.   The Appellate Court pointed out that, contrary to petitioner's argument that his counsel did not impeach Fulton, the parties entered into a stipulation agreeing that if Jeff Bridick would have testified he would have testified that he interviewed Fulton and that he could not name and did not know the people involved in the shooting.   This stipulation was used to impeach Fulton's testimony in closing argument and the jury then could determine Fulton's credibility.   As the Appellate Court pointed out, the jury chose to believe Fulton's testimony.

Petitioner has offered nothing to suggest that counsel's choice to use the stipulation as a form of impeachment in closing instead of impeaching Fulton, as was done in the first trial, with his actual statement to the police was deficient (Doc. 22 Ex. U at pp. 810-14).   *See Bailey v. Lemke*, 735 F.3d 945, 951 (7th Cir. 2013) (counsel not ineffective when relied on stipulation instead of impeaching witness with actual transcript).

Further, the Appellate Court found that there was ample evidence in the record to convict petitioner so that any errors made by counsel would not have changed the outcome of the trial.   The Appellate Court pointed out that the evidence against petitioner was not closely balanced.   The Appellate Court noted that Christopher Fulton identified the three men as the individuals who shot Mosby and that Mosby was shot close in time and location to the other murders.   The forensic evidence also linked Sherrell Towns directly to the crimes as his fingerprints were found at the crime scene and a 9-millimeter gun was determined to have been used in the shooting, and testimony suggested Sherrell Towns had a 9-millimeter.   Further, other witnesses testified Sherrell and petitioner were together on the night of the murders.   The two Lockett brothers and Lumpkin's testimony further linked petitioner to the murders and Mosely testified that Sherrell was going to pick up petitioner before the murders because he knew the people they were going to rob.   This Court similarly finds the other evidence in the case against petitioner to be strong and counsel's decision not to impeach Fulton's directly with his previous testimony, even if incorrect, would not have changed the

outcome of the trial given the evidence against petitioner.    Petitioner's Claim 3(a) is dismissed.

### 2.      Claim 3(c)

Petitioner's other claim regarding ineffective assistance of counsel alleges that his counsel improperly failed to object to the State's use of other crimes evidence.   The Appellate Court noted that the testimony regarding petitioner's other crimes were insignificant.   Lumpkins testified that petitioner was involved with selling drugs but testimony of various other witnesses informed the jury that Thompson's trailer was a known drug house and petitioner was seen at Thompson's trailers on other occasions.   Lockett's testimony that petitioner had people shoot at him was speculative.   Further, the Appellate Court found that the evidence against petitioner was overwhelming so that these two statements from witnesses regarding other crimes would not have affected the outcome of the trial. The Court finds the Appellate Court's findings to be reasonable in light of the evidence against petitioner.   Petitioner's Claim 3(c) is thus also denied.

### D.    Claims Raised in Petitioner's Reply

Petitioner seeks to raise several new claims in his two Reply briefs. Specifically, in his Reply brief, petitioner argues for the first time that the trial court erred in tendering People's IPI number 7, IPI 3.06-3.07, a jury instruction to the jury which petitioner feels violated his rights (Doc. 28).   Petitioner's supplemental Reply also argues that his counsel was ineffective for failing to object to an all-white jury (Doc. 29).   Neither claim was raised in his original petition and in any event,

the claims would be procedurally defaulted as petitioner only raised the claims in his post-conviction petition.   Thus, these claims are also dismissed.

## E.   Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   A petitioner cannot appeal a dismissal of his habeas petition unless he obtains a Certificate of Appealability.   *See* 28 U.S.C. § 2253(c)(1).   A Certificate of Appealability may only be issued where the petitioner "has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2); *Evans v. Circuit Ct. of Cook Cnty., Ill.*, 569 F.3d 665, 667 (7th Cir. 2009).   This requirement has been interpreted by the Supreme Court to mean that an applicant must show that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."   *Miller-el v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).   While a petitioner need not show that his appeal will succeed, he must show "something more than the absence of frivolity" or the existence of mere "good faith" on his part.   *Id*. at 338 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).   Here, the undersigned finds no basis for a determination that its decision to dismiss petitioner's claims was debatable or incorrect.   Petitioner's claims were dismissed because they were either procedurally defaulted, a ground which a reasonable jurist would not find

debatable, or meritless.   Accordingly, the Court **DENIES** petitioner a Certificate of Appealability in this case.

## IV.    <u>Conclusion</u>

Therefore, the Court **DENIES** petitioner's § 2254 petition for writ of habeas corpus and **DISMISSES with prejudice** all of the claims he raises as either procedurally defaulted, non-cognizable, or meritless.   The Clerk of the Court is **DIRECTED** to enter judgment accordingly.   The Court further **DENIES** petitioner a Certificate of Appealability under 28 U.S.C. § 2253(c).

**IT IS SO ORDERED**.

Digitally signed
by David R.
Herndon
Date: 2014.03.04
16:23:47 -06'00'

**Chief Judge**
**United States District Court**